UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | Criminal No. |
|  | ) | Violations: |
| v. | ) ) |  |
|  | ) ) | Counts One-Two: Wire Fraud; Aiding and Abetting |
| JULIO LOPEZ, | ) | (18 U.S.C. §§ 1343 and 2) |
| Defendant | ) ) |  |
|  | ) ) | Count Three: Conspiracy to Defraud the United States |
|  | ) ) | (18 U.S.C. § 371) |
|  | ) ) |  |
|  | ) ) | Forfeiture Allegation: |
|  | ) ) | (18 U.S.C. § 981(a)(1)(C) and |
|  | ) | 28 U.S.C. § 2461) |

INFORMATION

At all times relevant to this Information:

General Allegations

1.      Julio LOPEZ ("LOPEZ") resided at various times in Massachusetts and California.

2.      PERSON 1 was an individual residing in Worcester, Massachusetts and Alpharetta, Georgia.

3.      Bay State Corporation, *a/k/a* B. State Service Company, Bay State, or B. State ("BAY STATE") was a temporary employment agency doing business in and around Worcester, Massachusetts.  LOPEZ worked for BAY STATE from in or around 2012 until in or around November 2017.  While not the named owner, PERSON 1 exercised management and control over BAY STATE's operations and capital.

4.      Tam VUONG was an individual residing in Worcester, Massachusetts.

1

5.      Prime Labor Services LLC ("PRIME") was a temporary employment agency doing business in and around Worcester, Massachusetts.  LOPEZ worked for PRIME from in or around 2012 until in or around November 2017.  While LOPEZ was the nominal manager of PRIME, VUONG exercised management and control over its operations and capital.

6.      PERSON 2 was an individual residing in Worcester, Massachusetts.  PERSON 2 is a relative of VUONG.

7.      U.T. Services Inc., *a/k/a* UT Services or U.T. Services ("UT SERVICES") was a temporary employment agency doing business in and around Worcester, Massachusetts.  LOPEZ worked for UT SERVICES beginning in or around December 2017 through in or around October 2018.  While PERSON 2 was the nominal manager of UT SERVICES, VUONG exercised management and control over its operations and capital.

Temporary Employment Agencies

8.      The term "temporary employment agency" refers to a staffing business that provides client companies with workers, sometimes on a short-term basis.  The agency typically handles the administrative and accounting tasks associated with the hiring and employment process, while the client company directs the day-to-day work activities of the temporary workers.

9.      In temporary employment agency arrangements, the agency is ordinarily responsible for paying its employees, for paying state and federal employment taxes, and for processing payroll deductions for taxes and Social Security obligations.  The agency is also responsible for meeting certain other fiduciary responsibilities of employers, including

maintaining workers' compensation insurance for its employees.  For these services, client companies pay fees to the agency.

Federal Employment/Payroll Taxes

10.     Federal tax laws require employers, including temporary employment agencies, to file Internal Revenue Service ("IRS") Form 941 (Employer's Federal Quarterly Tax Return), which is used to report and pay all Federal employment taxes, which consist of Social Security tax and Medicare tax, as well as income taxes withheld from employees. Employers are required to file a Form 941 four times per year, one for each quarter ending March 31 (Q1), June 30 (Q2), September 30 (Q3), and December 31 (Q4).  The Form 941 must be filed by the last day of the calendar month following the last month of a given quarter (*e.g.*, the Form 941 for Q1 would be due by April 30).

11.     Social Security and Medicare taxes are mandated by the Federal Insurance Contributions Act ("FICA"). The FICA tax rate is 15.3% of an employee's wages.  Each employee is liable for only one-half of this 15.3%, or 7.65%, and employers are liable for the other half.  Employers are required by federal tax law to withhold the employee share of the FICA taxes from their employees' pay.  In filing a Form 941 with the IRS, an employer is required to report its total payments to employees and to report both the employee and the employer shares of the FICA taxes. At the same time, employers are required to deliver to the IRS the employee share of the FICA taxes and to pay the employer's share.

12.     Under federal law, employers are also required to withhold taxes from their employees' wages to be credited toward those employees' federal income tax obligations. These

3

withholdings, too, are required to be shown on the Forms 941, and the funds are required to be delivered to the IRS on a quarterly basis.

Workers' Compensation Insurance in Massachusetts

13.     The laws of the Commonwealth of Massachusetts require employers to obtain workers' compensation insurance coverage so that employees who suffer work-related injuries may be compensated.

14.     As with other forms of insurance, employers obtain workers' compensation insurance by paying premiums to insurance companies, which issue insurance policies that cover the employers' obligations to pay for on-the-job injuries.

15.     Workers' compensation insurance is commonly obtained for a fixed period, typically one year, known as the insurance policy term.

16.     As with other forms of insurance, premiums for workers' compensation insurance are based in part on factors related to the degree of risk the insurance company is assuming.  The factors used in calculating a particular employer's workers' compensation insurance premium include: (1) the total wages of the employees to be covered (known as "payroll" or "exposure"); (2) the nature of the employees' work activities (known as "classification"); and (3) the employer's history of work-related injuries.

17.     On the application for insurance at the beginning of a policy term, the employer is required to provide the workers' compensation insurance company with estimates of its anticipated payroll during the upcoming policy term, as well as information regarding the job classifications of its employees.  These payroll estimates are used to determine an estimated

4

premium, which the employer may be required to pay, in part or in full, before or during the policy term.

18.     After the close of a policy term, the insurance company commonly conducts an audit of the employer's actual payroll during the policy term.  Interim audits may also be conducted during the policy term to check the accuracy of the employer's payroll estimates and, if necessary, to adjust the amount of any installment payments the employer may be obligated to pay.

19.     During such audits, the employer is required to report to the insurance company its actual payroll during the policy term.  The employer may also be required to furnish records, such as employment tax withholding records or bank records, to verify its payroll figures.

Commonwealth of Massachusetts – Unemployment Insurance

20.     The federal government requires each state to implement a wage reporting system that tracks the payment of wages to employees.  This system is used to ensure the fairness of a host of programs, including unemployment insurance.  In Massachusetts, the Massachusetts Department of Revenue is the agency responsible for establishing and maintaining the required wage reporting database.

21.     Most employers in Massachusetts must pay unemployment insurance contributions, and are required to file a Massachusetts Department of Revenue Form WR-1 (Employer's Quarterly Report of Wages Paid) on a quarterly basis.  On the Form WR-1, an employer lists the total number of its employees for a given quarter and the total wages paid to these employees, and also lists each individual worker by name, Social Security number, and wages paid.

22.     Most employers in Massachusetts also must file a Quarterly Contribution Report with the Massachusetts Department of Workforce Development, Division of Unemployment Assistance.  On the Quarterly Contribution Report, an employer lists the total number of its employees for a given timeframe and the total wages paid to these employees, and also calculates the Unemployment Insurance Contribution due to the Massachusetts Division of Unemployment Assistance.

BAY STATE

23.     BAY STATE employed individuals who were assigned to work at locations maintained by BAY STATE client companies.  In exchange, the client companies paid BAY STATE via check or electronic wire transfer.

24.     BAY STATE filed regular Forms 941 listing the purported number of employees who worked for BAY STATE and the wages paid to such employees for a relevant quarter.

25.     BAY STATE obtained workers' compensation insurance through Travelers Insurance.  During regular audits, Travelers Insurance sought information from BAY STATE regarding its current and anticipated future business.  BAY STATE provided Traveler's Insurance with information – including Forms 941 – reflecting the purported number of employees who worked for BAY STATE and the wages paid to such employees.

UT SERVICES

26.     Following the execution of federal search warrants at locations associated with BAY STATE and PRIME in November 2017, a number of BAY STATE and PRIME's client companies began obtaining temporary workers from UT SERVICES.  Beginning in or about December 2017, UT SERVICES provided temporary workers to these and other client

companies and, in exchange, those client companies paid UT SERVICES via check or electronic wire transfer.

27.     UT SERVICES obtained workers' compensation insurance through Travelers Insurance.  During a January 2018 audit, Travelers Insurance sought information from UT SERVICES regarding its current and anticipated future business.  VUONG provided Travelers Insurance with this information, including information regarding the purported number of UT SERVICES employees and the wages earned by those employees.

28.     UT SERVICES utilized an accounting and payroll company ("the Payroll Company") to prepare the quarterly Forms 941, and to prepare the required Massachusetts forms (WR-1 and the Quarterly Contribution Report).  VUONG provided the Payroll Company with information regarding the purported number of UT SERVICES employees and the wages earned by those employees.

Scheme to Defraud #1 – BAY STATE

29.     From in or around 2012 through in or around November 2017, PERSON 1 and LOPEZ engaged in a scheme to defraud Travelers Insurance and others by materially misrepresenting the number of employees who worked for BAY STATE and the wages earned by such employees.

30.     In order to effectuate this scheme, BAY STATE accepted payments from its client companies, paid the majority of BAY STATE employees in cash, and then failed to report its cash wages to Travelers Insurance (in connection with its workers' compensation insurance policy), on its Forms 941, and elsewhere.

31.     In compiling and transmitting employee and wage information conveyed to Travelers Insurance and included in quarterly Forms 941, Forms WR-1, and Quarterly Contribution Reports, among other filings, PERSON 1 omitted the cash wages as well as reference to employees paid in cash and the client companies to which those employees were assigned.  Instead, PERSON 1 reported only the small fraction of BAY STATE employees (and corresponding client companies) that were paid by check.  Thus, PERSON 1 knowingly concealed BAY STATE employees and wages.

32.     Travelers Insurance calculated the premium due for BAY STATE's workers' compensation policy based on the fraudulent misrepresentations and omissions.  Thus, BAY STATE paid an artificially low premium for workers' compensation insurance.

33.     LOPEZ used the email address "juliolopez111@gmail.com" to conduct business on behalf of BAY STATE, including to communicate with PERSON 1 and with various BAY STATE clients.

34.     During the time that LOPEZ worked for BAY STATE, he knew that only a small percentage of BAY STATE employees were processed through the company's payroll system to be paid via check, and that the majority of BAY STATE employees were paid in cash without having taxes deducted from their paychecks.  LOPEZ arranged for cash to be transmitted to numerous temporary workers who performed work at BAY STATE client companies.

35.     In 2016, one BAY STATE client conducted an audit during which it requested pay stubs for the BAY STATE employees who performed work on behalf of that client. PERSON 1 fabricated payroll documents that falsely showed the employees were paid by check and that deductions were taken from the employees' paychecks for payroll taxes, including for

federal income taxes and Medicare tax.  LOPEZ provided these fabricated documents to the

BAY STATE client, despite knowing that these BAY STATE employees had not been paid via

check or processed via the company payroll system, and that no wages were deducted for tax

purposes.

Scheme to Defraud #2 – UT SERVICES

36.    From in or around December 2017 through in or around October 2018, VUONG

and LOPEZ engaged in a scheme to defraud Travelers Insurance and others by materially

misrepresenting the number of employees who worked for UT SERVICES and the wages earned

by such employees.

37.    In order to effectuate this scheme, UT SERVICES accepted payments from its

client companies, paid the majority of UT SERVICES employees in cash, and then failed to

report its cash wages to Travelers Insurance (in connection with its workers' compensation

insurance policy), on its Forms 941, and elsewhere.

38.    In compiling and transmitting employee and wage information conveyed to

Travelers Insurance and included in quarterly Forms 941, Forms WR-1, and Quarterly

Contribution Reports, among other filings, VUONG omitted the cash wages as well as reference

to employees paid in cash and the client companies to which those employees were assigned.

Instead, VUONG reported only the small number of employees (and corresponding client

companies) who were paid by check, thus knowingly concealing both employees and wages.

39.    For example, during a January 2018 audit, VUONG concealed from Travelers'

Insurance various UT SERVICES client companies, employees and the cash wages paid to those

employees .  During this audit, VUONG represented that UT SERVICES had zero clients,

9

whereas, in fact, UT SERVICES had at least three clients for which temporary workers had worked hundreds of hours.

40.     Travelers Insurance calculated the premium due for UT SERVICES workers' compensation policy based on VUONG's fraudulent misrepresentations and omissions.  Thus, UT SERVICES paid an artificially low premium for workers' compensation insurance.

41.     VUONG also failed to report to the Payroll Company the employees paid in cash and the cash wages, causing the Payroll Company to underreport the true amount of wages and the true number of employees on the Forms 941 filed on behalf of UT SERVICES.  During the time that LOPEZ provided services to UT SERVICES, he knew that law enforcement had been investigating PRIME and BAY STATE for concealing cash payroll.

42.     LOPEZ helped facilitate the business dealings between UT SERVICES and two of its client companies, including by transmitting client invoices via email.

43.     LOPEZ used the email address "utservicesinc@gmail.com" to conduct business on behalf of UT SERVICES.  LOPEZ associated a false name with this email address so that his own name would not be tied to UT SERVICES.

44.     During the time that LOPEZ worked for UT SERVICES, he knew that the UT SERVICES paid its workers in cash.  LOPEZ arranged for cash wages to be transmitted from VUONG to certain temporary workers who performed work at two UT SERVICES client companies.

45.     During the time that LOPEZ worked for UT SERVICES, he received and updated spreadsheets that reflected the amount of revenue received by UT SERVICES from two client companies.  These spreadsheets reflect that this revenue was used to pay workers, to pay

LOPEZ, and for various other uses.  These spreadsheets do not reflect any money withheld for

tax purposes.

Conspiracy to Defraud the IRS

Object and Purpose of the Conspiracy

46.     The object of the conspiracy was to subvert the function of the IRS to ascertain,

compute, assess, and collect taxes arising from the employment of various individuals by BAY

STATE, including payroll and income taxes.  The principal purpose of the conspiracy was to

increase BAY STATE's profits and, thereby, to enrich the coconspirators personally.

Manner and Means of the Conspiracy

47.     Among the manner and means by which LOPEZ and coconspirators known and

unknown to the United States Attorney carried out the conspiracy were the following:

      a.  LOPEZ and others paid BAY STATE employees in cash;

      b.  PERSON 1 and others intentionally failed to process the majority of BAY
          STATE employees through the BAY STATE payroll system so as to avoid the
          calculation of payroll tax deductions and the creation of W-2 forms; and

      c.  LOPEZ, PERSON 1, and others failed to deduct taxes from BAY STATE
          employees' pay.

Overt Acts in Furtherance of the Conspiracy

48.     From in or around 2012 through in or around November 2017, LOPEZ and

coconspirators known and unknown to the United States Attorney committed and caused to be

committed the following overt acts, among others, in furtherance of the conspiracy:

      a.  On or about August 15, 2016, PERSON 1 sent an email to LOPEZ attaching
          fabricated pay stub records for certain BAY STATE employees.

      b.  In or around August 2016, LOPEZ delivered fabricated pay stub records to a
          BAY STATE client.

      c.  On or about July 11, 2017, LOPEZ sent an email to a BAY STATE employee
          seeking cash to pay BAY STATE workers.

12

## COUNT ONE

Wire Fraud
(18 U.S.C. §§ 1343 and 2)

The United States Attorney charges:

49.     The United States Attorney re-alleges and incorporates by reference paragraphs 1-25 and 29-35.

50.     From in or around 2012 through in or around November 2017, in the District of Massachusetts, and elsewhere, the defendant,

JULIO LOPEZ,

having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme to defraud, as set forth below:

| Count | Approximate Date | Description |
|-------|------------------|-------------|
| 1 | August 12, 2016 | Email from LOPEZ to PERSON 1 forwarding BAY STATE client request for employee paystubs |

All in violation of Title 18, United State Code, Sections 1343 and 2.

13

COUNT TWO
Wire Fraud
(18 U.S.C. §§ 1343 and 2)

The United States Attorney further charges:

51.     The United States Attorney re-alleges and incorporates by reference paragraphs 1-22, paragraphs 26-28, and paragraphs 36-45.

52.     From in or around December 2017 through in or around October 2018, in the District of Massachusetts, and elsewhere, the defendant,

JULIO LOPEZ,

having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme to defraud, as set forth below:

| Count | Approximate Date | Description |
|-------|------------------|-------------|
| 2 | September 5, 2018 | Email from LOPEZ to UT SERVICES client attaching invoice |

All in violation of Title 18, United State Code, Sections 1343 and 2.

14

## COUNT THREE
### Conspiracy to Defraud United States
### (18 U.S.C. § 371)

The United States Attorney further charges:

53.     The United States Attorney re-alleges and incorporates by reference paragraphs 1-25, 29-35, and 46-48.

54.     From in or around 2012 through in or around November 2017, in the District of Massachusetts, and elsewhere, the defendant,

### JULIO LOPEZ,

conspired with persons known and unknown to the United States Attorney, including PERSON 1, to defraud the United States of America and an agency thereof, to wit, the United States Treasury Department, IRS, by impeding, impairing, obstructing, and defeating the lawful government functions of the IRS in the ascertainment, computation, assessment, and collection of the revenue, to wit, federal payroll and income taxes owed by BAY STATE.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATION
### (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

55.     Upon conviction of one or more of the offenses in violation of Title 18, United States Code, Section 1343, set forth in Counts One and Two, the defendant,

JULIO LOPEZ,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.  The property to be forfeited includes, but is not limited to, the following assets:

      a.   A forfeiture money judgment to be entered in an amount to be determined.

56.     If any of the property described in Paragraph 55, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant --

      a.   cannot be located upon the exercise of due diligence;

      b.   has been transferred or sold to, or deposited with, a third party;

      c.   has been placed beyond the jurisdiction of the Court;

      d.   has been substantially diminished in value; or

      e.   has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 55 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United

States Code, Section 2461(c).

> ANDREW E. LELLING
> United States Attorney
>
> By: _____
> WILLIAM F. ABELY
> Assistant U.S. Attorney